## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

MEE MEE BROWN,

                Plaintiff,

      vs.

SHERI DAWSON, Director of
Behavioral Health; JOHN KROLL,
Director of Nursing @ Norfolk Regional
Center; DIANE SCHUMACHER,
Physician Assistant @ Norfolk Regional
Center; AMR BELTAGUI, Personal
Psychiatrist @ Norfolk Regional Center;
LINDA HANSEN, Unit Supervisor @
Norfolk Regional Center; DIANNA
MASTNY, LORI STRONG, DR. JEAN
LANGE, DR. DAVID MITCHELL,
BEVERLY LEUSHEN, and DONNA
CRIST,

                Defendants.

**8:16CV569**


**MEMORANDUM
AND ORDER**

      This matter is before the court on the Defendants' Motion for Summary Judgment (Filing No. 43) and Defendants' Motion to Strike (Filing No. 54). For the reasons that follow, Defendants' Motion for Summary Judgment is granted, and Defendants' Motion to Strike is denied.

## I. BACKGROUND

      Plaintiff Mee Mee Brown ("Brown") filed this action pursuant to 42 U.S.C. § 1983 against Susan Dawson ("Dawson"), the Nebraska Department of Health and Human Services ("DHHS") Director of the Division of Behavioral Health, and various employees of the Norfolk Regional Center ("NRC") where Brown was

committed for inpatient sex offender treatment.[1] Brown seeks declaratory, injunctive,[2] and monetary relief against the defendants in their individual capacities for denying Brown a medical evaluation by a specialist and estrogen therapy for gender-identity disorder ("GID") (deliberate indifference claim); preventing Brown from advancing in her treatment program in retaliation for Brown filing lawsuits and contacting the Ombudsman regarding the exercise of her "transgender rights" (First Amendment retaliation claim); and treating Brown unfavorably because of her gender non-conformity (equal protection claim).

After a review of the Second Amended Complaint (Filing No. 22) and Supplemental Second Amended Complaint (Filing No. 23), the court allowed Brown's following claims to proceed: (1) deliberate indifference claim against defendants Diane Schumacher ("Schumacher") and Amr Beltagui ("Dr. Beltagui"); (2) First Amendment retaliation claim against defendants John Kroll ("Kroll"), Linda Hansen ("Hansen"), Dianna Mastny ("Mastny"), Lori Strong ("Strong"), Jean Laing ("Dr. Laing"), David Mitchell ("Dr. Mitchell"), Beverly Lueshen ("Lueshen"), and Donna Crist ("Crist"); and (3) equal protection claim against all defendants. (Filing No. 28 at CM/ECF pp. 9-11, 14.)[3]

---

[1] Brown was transferred to the Lincoln Regional Center ("LRC") on February 28, 2018. (Filing No. 61.)

[2] Brown requests that the court order the defendants to grant her request to seek medical attention for gender-identity disorder and to receive hormone treatments. (Filing No. 22 at CM/ECF p. 11.)

[3] The court has corrected the spelling of the defendants' names.

## II. RELEVANT UNDISPUTED MATERIAL FACTS[4]

1.      The DHHS administers the clinical programs and services of the LRC and the NRC. Neb. Rev. Stat. § 83-101.06.

2.      The DHHS supervises the LRC and the NRC. Neb. Rev. Stat. § 83-107.01.

3.      The state hospital for the mentally ill established in Madison County, Nebraska is known as the NRC. Neb. Rev. Stat. § 83-305.

4.      The state hospital for the mentally ill established in Lancaster County, Nebraska is known as the LRC. Neb. Rev. Stat. § 83-305.

---

[4] The defendants have complied with the court's local rule by including in their supporting brief (Filing No. 89 at CM/ECF pp. 2-16) "a separate statement of material facts about which the moving party contends there is no genuine issue to be tried and that entitles the moving party to judgment as a matter of law." NECivR 56.1(a). Brown has not submitted a brief containing a concise response to each of the defendants' statement of material facts, which contains proper references to the record. *See* NECivR 56.1(b)(1). Instead, she includes her own "Statement of Material Facts." (Filing No. 52 at CM/ECF p. 2.) Although Brown appears pro se, she is "bound by and must comply with all local and federal procedural rules." NEGenR 1.3(g); *see also Schooley v. Kennedy*, 712 F.2d 372, 373 (8th Cir. 1983) (per curiam) (concluding pro se litigants are not excused from compliance with procedural and local rules). The court does consider the facts alleged in Brown's verified complaints (Filing Nos. 22, 23) and attached exhibits and Brown's exhibits (Filing No. 53) filed in support of her opposition to the summary judgment motion. *See Spear v. Dayton's*, 733 F.2d 554, 555-56 (8th Cir. 1984) ("[A] litigant, especially one unrepresented by counsel . . . is [not] under a duty to repeat his verified allegation in a new affidavit. . . . This is not, in other words, a case of a plaintiff who simply rested on the unverified allegations of his pleadings.").

5.     On December 19, 2013, Brown was committed to the DHHS for inpatient sex offender treatment by the Douglas County Mental Health Board after being identified as a dangerous, untreated sex offender. (Filing No. 45-2 at CM/ECF p. 1, ¶ 5; Filing No. 52 at CM/ECF p. 2.)

6.     Brown was a patient at the NRC from December 2013 through September 2015. (Filing No. 45-2 at CM/ECF p. 2, ¶ 6; Filing No. 52 at CM/ECF p. 2.)

7.     Brown was a patient at the LRC from September 2015 until Brown's readmission to the NRC in October 2016. (Filing No. 45-2 at CM/ECF p. 2, ¶ 7; Filing No. 52 at CM/ECF p. 2.)

8.     Brown was returned to the NRC because of repeated threats of aggression and refusal to follow a safety plan after it was discovered that Brown had been involved in a sexual relationship with a peer. (Filing No. 45-2 at CM/ECF p. 2, ¶ 8; Filing No. 45-8 at CM/ECF p. 2, ¶ 9; Filing No. 52 at CM/ECF p. 2.)

**Sheri Dawson**

9.     At all times relevant, Dawson was the DHHS Director of the Division of Behavioral Health. (Filing No. 45-1 at CM/ECF p. 1, ¶ 3.)

10.     Dawson never personally refused Brown's requests to have a private bathroom after male patients allegedly looked under a stall where Brown was using a toilet. Any decisions regarding these requests would have been made by the NRC administration. (Filing No. 45-1 at CM/ECF p. 2, ¶ 7.)

11.     Dawson never personally refused Brown's request to dress in woman's clothing. Any decisions regarding these requests would have been made by the NRC administration. (Filing No. 45-1 at CM/ECF p. 2, ¶ 8.)

12.     Dawson received a written complaint from Brown on November 17, 2016. ([Filing No. 45-1 at CM/ECF p. 2](#), ¶ 9.) Brown referenced filing civil lawsuits in the complaint. ([Filing No. 45-1 at CM/ECF p. 2](#), ¶ 12, pp. 4-5 (Exhibit A).)

13.     Dawson received a written complaint from Brown dated November 28, 2016. ([Filing No. 45-1 at CM/ECF p. 2](#), ¶ 10.) Brown referenced filing civil lawsuits against DHHS in the complaint. ([Filing No. 45-1 at CM/ECF p. 2](#), ¶ 13, pp. 6-7 (Exhibit B).)

14.     Dawson provided Brown a written response dated December 15, 2016. ([Filing No. 45-1 at CM/ECF p. 2](#), ¶¶ 11, 14, p. 9 (Exhibit C).) Dawson requested Brown contact the Nebraska Attorney General's Office regarding the concerns. ([Filing No. 45-1 at CM/ECF p. 9](#).)

### **John Kroll**

15.     Kroll has been the Facility Operating Officer for the NRC since July 1, 2017. Kroll served as the Interim Facility Operating Officer at the NRC from January 2017 until July 1, 2017. Kroll served as the Director of Nursing at the NRC from January 1989 to January 2017. ([Filing No. 45-2 at CM/ECF p. 1](#), ¶ 3; [Filing No. 52 at CM/ECF p. 3](#).)

16.     Kroll has been employed by the NRC for approximately 41 years. ([Filing No. 45-2 at CM/ECF p. 1](#), ¶ 4.)

17.     Upon Brown's readmission to the NRC, Kroll's involvement with Brown was mainly through responding to grievances. ([Filing No. 45-2 at CM/ECF p. 2](#), ¶ 9.)

18.     Kroll talked to Brown regarding Brown's request for a private bathroom.  Brown was not able to provide any reason why a private bathroom was

required other than personal preference. Kroll advised Brown that the only time the NRC approves a patient for a private bathroom is when the patient has a physical need for a private bathroom. The NRC does not have enough room for Brown to have a private bathroom. (Filing No. 45-2 at CM/ECF p. 2, ¶ 10.)

19.     Brown was provided an order that Brown may use the bathroom on the unit in private. Other patients on the unit were instructed not to use the bathroom when Brown was using it.[5] (Filing No. 45-2 at CM/ECF p. 2, ¶ 11.)

20.     Brown submitted a grievance about another patient peering under the toilet stalls while Brown was using a toilet stall in the unit bathroom. Kroll talked to the patient after Brown submitted the grievance. The patient did not realize he was not supposed to be in the bathroom while Brown was in a bathroom unit stall. The patient advised that he would not use the bathroom while Brown was in the bathroom anymore. Kroll advised Brown of his discussion with the other patient, and Brown was fine with the resolution of the matter.[6] (Filing No. 45-2 at CM/ECF p. 2, ¶ 12.)

21.     Brown also submitted a complaint that staff member Rose Prather ("Prather"), a Mental Health Security Specialist, was not enforcing with other

---

[5] In her opposition brief, Brown disputes that she was agreeable to this arrangement. (Filing No. 52 at CM/ECF p. 5.) Resolution of this dispute is unnecessary, however, because it does not affect the outcome of the lawsuit. Indeed, even assuming that Brown was not agreeable to the bathroom arrangement, it does not create a genuine issue of disputed material fact with respect to any of the constitutional claims.

[6] Any dispute that Brown was satisfied with the resolution of the bathroom incident is inconsequential because it does not affect the outcome of the lawsuit. Indeed, even assuming that Brown was not satisfied with the resolution, it does not create a genuine issue of disputed material fact with respect to any of the constitutional claims.

patients Brown's order to be allowed to use the bathroom alone. Kroll advised Prather of the concern about monitoring the bathroom when Brown used it, and Prather said she was unaware of the order but would work to assist other patients in not entering the bathroom when Brown was in it. To Kroll's knowledge, there have been no further issues regarding Brown having privacy while using the bathroom on the unit. (Filing No. 45-2 at CM/ECF p. 3, ¶ 12.)

22.    Kroll never made an entry in Brown's treatment file to the mental health board. It is the treatment team that makes entries in Brown's treatment file. Kroll never corresponded with the mental health board about Brown. (Filing No. 45-2 at CM/ECF p. 3, ¶ 13.)

23.    Kroll never discussed Brown's progression in treatment with Brown. Kroll never refused Brown the ability to progress past Level One in treatment. Kroll has no influence on Brown's treatment progression or scoring, or the treatment progression or scoring of other NCR patients. The progression of Brown's treatment is a treatment team decision. (Filing No. 45-2 at CM/ECF p. 3, ¶ 15.)

24.    Since being readmitted to the NRC, Brown has been approved to wear female undergarments and gender neutral outerwear. Brown was agreeable to that arrangement. (Filing No. 45-2 at CM/ECF p. 3, ¶ 16.)

25.    In order to preserve the safety and security of the NRC, Brown is not approved to wear dresses; midriff, low-cut or see-through shirts or blouses; high heels; stockings; nylons; or make-up. The NRC is a mental health hospital treating patients who have difficulty managing sexually deviant thoughts and ideas. The NRC must prevent patients from making unwanted sexual advances toward other patients, or inappropriately acting out on their sexual urges. (Filing No. 45-2 at CM/ECF pp. 3-4, ¶ 17.)

26.     All patients of the NRC are required to wear appropriate clothing at all times. Tank tops and sleeveless shirts are only appropriate during participation in athletic activities and during courtyard time. Net shirts are not allowed. ([Filing No. 45-2 at CM/ECF p. 4](), ¶ 18.)

27.     All employees, consultants, and students of the NRC are required to wear appropriate clothing that provides for safety and security needs. Shorts or skorts are not worn. Crop pants are allowed but must be at mid-calf length or longer. Spandex pants, leggings, sweat pants, running/workout pants, lounge pants, or any type of pajama outfits are not allowed. The Personal Development Supervisor and staff may wear work out gear commensurate with the activities and expectations of the facilitation of their groups and activities. Shirts/blouses must be appropriate at all times. No spaghetti straps or tank tops are allowed. No midriff or cleavage may be exposed. Skirts are appropriate to the responsibilities of the staff's position and are not provocative and must be mid-calf or longer. Clothing that is excessively tight or see-through is not allowed. Footwear that increases the risk of falling is not allowed. ([Filing No. 45-2 at CM/ECF p. 4](), ¶ 19.)

28.     All NRC patients and visitors are expected to be neatly dressed and groomed for visits. Visiting may be denied when appropriate clothing is not worn. Shorts, skorts, mini-skirts, tank tops, low-cut tops, see-through, or other provocative clothing are not allowed during a visit. ([Filing No. 45-2 at CM/ECF p. 4](), ¶ 20.)

29.     The NRC received a copy of a letter from a judge that Brown had threatened self-harm. NRC staff met with Brown about the threat of self-harm. NRC staff did not assess Brown to be self-harmful after the meeting. ([Filing No. 45-2 at CM/ECF p. 5](), ¶ 21.)

30.     Kroll does not recall if Brown spoke to the Ombudsman. Kroll reviewed the file he has on Ombudsman's Office Inquiries and found nothing on

Brown for 2017 where the Ombudsman's Office asked Kroll for information on Brown. ([Filing No. 45-2 at CM/ECF p. 5](#), ¶ 22.)

31.     Kroll never prevented Brown from advancing in treatment because Brown contacted the Ombudsman. ([Filing No. 45-2 at CM/ECF p. 5](#), ¶ 23.)

32.     Kroll does not care if Brown contacts the Ombudsman. ([Filing No. 45-2 at CM/ECF p. 5](#), ¶ 24.)

33.     Kroll believes Brown has the right to contact the Ombudsman. ([Filing No. 45-2 at CM/ECF p. 5](#), ¶ 25.)

34.     Kroll never prevented Brown from advancing in treatment because Brown sued him. Kroll has no authority on whether or not Brown advances in treatment. ([Filing No. 45-2 at CM/ECF p. 5](#), ¶ 26.)

35.     Kroll does not remember the date in which he was served with the lawsuit. ([Filing No. 45-2 at CM/ECF p. 5](#), ¶ 27.)

36.     Brown is not the first patient to sue Kroll. ([Filing No. 45-2 at CM/ECF p. 5](#), ¶ 28.)

37.     Kroll is not offended when a patient files a lawsuit against him. ([Filing No. 45-2 at CM/ECF p. 5](#), ¶ 29.)

38.     Kroll believes Brown has the right to file a lawsuit. ([Filing No. 45-2 at CM/ECF p. 5](#), ¶ 30.)

39.     On January 4, 2017, Brown was diagnosed with gender dysphoria at a Diagnostic Staff Meeting. This diagnosis did not affect any decisions regarding the clothing which Brown is approved to wear as a patient at the NRC. ([Filing No. 45-2 at CM/ECF p. 5](#), ¶ 31.)

40. On July 6, 2017, Kroll provided a written response to the written referral request submitted by Dr. Beltagui on December 2, 2016. Kroll advised that the referral was not approved because the plan was to verify if Brown was currently being treated with hormone therapy. Kroll stated that Brown provided information that Brown had been treated by Dr. Walburn at the Nebraska Medical Center. Kroll advised that the NRC received a letter from Dr. Walburn that Brown had not been treated with hormone therapy. Kroll stated that the request was denied due to no verification of patient under hormone therapy. (Filing No. 45-2 at CM/ECF pp. 5-6, ¶ 32.)

## **Diane Schumacher**

41. Schumacher has been employed at the NRC since December 1995. (Filing No. 45-3 at CM/ECF p. 1, ¶ 3.)

42. Schumacher is a licensed Physician Assistant in the State of Nebraska. Schumacher has a Master's Degree from the University of Nebraska Medical Center ("UNMC") Physician Assistant program. Schumacher has a Bachelor's of Science from the University of Nebraska-Lincoln ("UNL") and from UNMC. (Filing No. 45-3 at CM/ECF p. 1, ¶ 4.)

43. At all times relevant, Schumacher was a Physician Assistant at the NRC. (Filing No. 45-3 at CM/ECF p. 1, ¶ 5; Filing No. 52 at CM/ECF p. 8.)

44. Schumacher does not recall being involved in the decision making regarding Brown's request for a private bathroom. (Filing No. 45-3 at CM/ECF p. 2, ¶ 9; Filing No. 53 at 104-05, Response to Interrogatory No. 15.)

45. Schumacher never denied Brown's request to take estrogen. Schumacher recalls discussing Brown's requests for hormone therapy and estrogen treatment on several occasions and advising the requests needed to be directed to

the psychiatrist. Schumacher recalls advising Brown on several occasions that it was not a part of her scope of practice to grant requests for hormone therapy or estrogen treatment. (Filing No. 45-3 at CM/ECF p. 2, ¶ 11; Filing No. 53 at 104, Responses to Interrogatory Nos. 13, 14.)

46. Schumacher was not aware of Brown having hormone treatment before Brown was incarcerated. (Filing No. 45-3 at CM/ECF p. 2, ¶ 12.)

47. Schumacher does not recall seeing any documents that showed a physician had prescribed hormone treatment for Brown. (Filing No. 45-3 at CM/ECF p. 2, ¶ 13.)

48. Other than Brown's self-report, Schumacher was not aware of Brown taking hormone pills prior to being incarcerated. (Filing No. 45-3 at CM/ECF p. 2, ¶ 14.)

49. Several attempts were made by the NRC staff to obtain the medical records to establish Brown had hormone treatment prior to being incarcerated. Brown would provide the name of doctors whom Brown claimed performed such treatments. The NRC would locate the addresses of the doctors and send records requests to them. The NRC would thereafter receive responses from the doctors stating no records were found regarding Brown. (Filing No. 45-3 at CM/ECF p. 3, ¶ 15.)

50. In her capacity as a Physician Assistant at the NRC, Schumacher attended to Brown's medical needs in the way in which a Physician Assistant is trained to attend to the medical needs of a patient. (Filing No. 45-3 at CM/ECF p. 3, ¶ 16.)

**Dr. Amr Beltagui**

51.     Dr. Beltagui was employed as a Staff Psychiatrist at the NRC from August 1, 2014 to July 31, 2017. Dr. Beltagui rendered psychiatric care to the NRC patients to whom he was assigned during this timeframe. (Filing No. 45-4 at CM/ECF p. 1, ¶ 3.)

52.     Dr. Beltagui holds a Bachelor of Medicine and Bachelor of Surgery (MBChB) degree from the University of Alexandria, Egypt. Dr. Beltagui holds an Educational Commission for Foreign Medical Graduates (ECFMG) certificate. Dr. Beltagui holds a Certificate of Residency from the University at Buffalo, State University of New York. Dr. Beltagui holds a Medical Doctor (MD) degree from the State University of New York. Dr. Beltagui is Board Certified by the American Board of Psychiatry and Neurology. (Filing No. 45-4 at CM/ECF p. 1, ¶ 4.)

53.     In his capacity as Staff Psychiatrist at the NRC, Dr. Beltagui met with Brown, initially, on a monthly basis, and then less frequently, during Brown's first admission to the NRC from approximately September 2014 until Brown moved to the Lincoln Regional Center (LRC) in September 2015. Dr. Beltagui met with Brown, on a weekly basis, for the first eight weeks after Brown's second admission to the NRC in October 2016, and then on a monthly basis, until leaving employment at the NRC in July 2017. (Filing No. 45-4 at CM/ECF p. 2, ¶ 5.)

54.     Upon Brown's readmission to the NRC, Dr. Beltagui approved Brown's request to wear female undergarments and gender-neutral outerwear, but denied Brown's request to wear female clothing such as dresses, midriff, low-cut or see-through shirts or blouses, high heels, stockings and nylons, and make-up. (Filing No. 45-4 at CM/ECF p. 2, ¶ 6.)

55.     It is the opinion of Dr. Beltagui that it would be a safety and security risk for Brown to wear dresses, midriff, low-cut or see-through shirts or blouses, high heels, stockings and nylons, or make-up at the NRC, because the NRC is an

all-male psychiatric hospital treating sex-offenders. It is the opinion of Dr. Beltagui that wearing such clothing would make Brown a potential target for sexual assault from other patients. (Filing No. 45-4 at CM/ECF p. 2, ¶ 7.)

56. Dr. Beltagui never disregarded Brown's request for hormone therapy. (Filing No. 45-4 at CM/ECF p. 2, ¶ 8; Filing No. 53 at CM/ECF pp. 77-78, Response to Interrogatory No. 14.)

57. On December 2, 2016, Dr. Beltagui submitted a written referral request for Brown to see a doctor in Omaha who specializes in transgender care and hormone therapy in Omaha for an evaluation. (Filing No. 45-4 at CM/ECF p. 2, ¶ 9; Filing No. 53 at CM/ECF pp. 77-78, Response to Interrogatory No. 14, p. 83.)

58. On December 2, 2016, the referral request was denied and Dr. Beltagui advised Brown of this decision. (Filing No. 45-4 at CM/ECF p. 2, ¶ 10; Filing No. 53 at CM/ECF p. 83.)

59. A few days later, Dr. Beltagui was advised Brown's referral was neither approved nor denied, but that his records from his previous providers, on the outside, prior to incarceration, were needed, before hormone therapy could be considered. Dr. Beltagui advised Brown of this decision and explained the initial denial had been a miscommunication. (Filing No. 45-4 at CM/ECF p. 3, ¶ 11.)

60. Dr. Beltagui believes the initial denial and subsequent requirement for records prior to a decision on the referral was caused by confusion and was not intentional. (Filing No. 45-4 at CM/ECF p. 3, ¶ 12.)

61. Brown's diagnosis was officially amended to include Gender Dysphoria at the Diagnostic Staff Meeting held on January 4, 2017. (Filing No. 45-4 at CM/ECF p. 3, ¶ 13.)

62.     According to the Diagnostic and Statistical Manual V, a Gender Dysphoria diagnosis involves a difference between one's experienced/expressed gender and assigned gender, and significant distress or problems functioning. It lasts at least six months and is shown by at least two of the following:

      a.      A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics;

      b.      A strong desire to be rid of one's primary and/or secondary sex characteristics;

      c.      A strong desire for the primary and/or secondary sex characteristics of the other gender;

      d.      A strong desire to be of the other gender;

      e.      A strong desire to be treated as the other gender;

      f.      A strong conviction that one has the typical feelings and reactions of the other gender.

(Filing No. 45-4 at CM/ECF p. 3, ¶ 14.)

63.     It is the opinion of Dr. Beltagui that not every individual who carries the diagnosis of Gender Dysphoria is a candidate for hormone therapy. It was beyond the scope of Dr. Beltagui's practice to determine whether Brown was a candidate for hormone therapy. It is the opinion of Dr. Beltagui such a determination should be made by a doctor who specializes in transgender care and hormone therapy after an evaluation. (Filing No. 45-4 at CM/ECF p. 3, ¶ 15.)

64.     Dr. Beltagui discussed Brown's statements regarding contemplating self-harm in the form of penis mutilation. Dr. Beltagui assessed Brown for the risk of self-harm upon this discussion. Dr. Beltagui understood from his discussion with Brown that the self-harm statements were made out of frustration as opposed to true intent to self-harm. Dr. Beltagui determined Brown was not a risk for self-harm at that time. (Filing No. 45-4 at CM/ECF p. 4, ¶ 16.)

65.     Other than Brown's self-report, Dr. Beltagui was not aware of any information or medical report to show Brown took hormone pills prior to incarceration. (Filing No. 45-4 at CM/ECF p. 4, ¶ 17.)

66.     Brown never mentioned being transgendered or requiring hormone therapy to Dr. Beltagui during Brown's first admission to the NRC. (Filing No. 45-4 at CM/ECF p. 4, ¶ 18.)

## Linda Hansen

67.     Hansen is a Registered Nurse licensed to practice in the State of Nebraska. (Filing No. 45-5 at CM/ECF p. 1, ¶ 3.)

68.     Hansen is the Nurse Supervisor of 3 West, one of the units on the Mainstream Treatment Program of the NRC. Hansen has been a Nurse Supervisor at the NRC for over 30 years. Hansen began supervision in the Sex Offender Treatment Program at the NRC in approximately 2007. (Filing No. 45-5 at CM/ECF p. 1, ¶ 4.)

69.     Hansen does not personally determine the level assignment for any patient upon their admission to the NRC. When a patient is admitted to the NRC, the level assignment is determined by the full treatment team. (Filing No. 45-5 at CM/ECF p. 2, ¶ 8.)

70.     Hansen finds each individual patient progresses in their own way. Hansen's job is to observe the behavior of the patients and instruct those under her supervision to observe the behavior of the patients. This behavior is then reported to the full treatment team to determine how the patient is progressing in the program. (Filing No. 45-5 at CM/ECF p. 2, ¶ 9.)

71.     Hansen was not part of the decision making process regarding what clothing Brown would be allowed to wear at the NRC. (Filing No. 45-5 at CM/ECF p. 2, ¶ 11.)

72.     Hansen never scored Brown's treatment plan. Hansen does not participate in the scoring of Brown's treatment plan. (Filing No. 45-5 at CM/ECF p. 2, ¶ 12; Filing No. 53 at 91, Response to Interrogatory No. 17.)

73.     Hansen never prevented Brown from advancing in treatment because Brown contacted the Ombudsman. (Filing No. 45-5 at CM/ECF p. 2, ¶ 13.)

74.     Hansen does not recall Brown contacting the Ombudsman's Office. (Filing No. 45-5 at CM/ECF p. 2, ¶ 14.)

75.     Hansen believes Brown has the right to contact the Ombudsman's Office. (Filing No. 45-5 at CM/ECF p. 2, ¶ 15.)

76.     Hansen does not care if Brown contacts the Ombudsman's Office. (Filing No. 45-5 at CM/ECF p. 2, ¶ 16.)

77.     Hansen never prevented Brown from advancing in treatment because of this lawsuit. (Filing No. 45-5 at CM/ECF p. 3, ¶ 17.)

78.     Hansen does not remember when she learned about this lawsuit or when she was served. (Filing No. 45-5 at CM/ECF p. 3, ¶ 18.)

79.     Hansen believes Brown has the right to file a lawsuit. (Filing No. 45-5 at CM/ECF p. 3, ¶ 19.)

**Dianna Mastny**

80.    At all times relevant, Mastny was a Registered Nurse licensed to practice nursing in the State of Nebraska. (Filing No. 45-6 at CM/ECF p. 1, ¶ 3.)

81.    Mastny has been employed at the NRC for almost 20 years. (Filing No. 45-6 at CM/ECF p. 1, ¶ 4.)

82.    Mastny is currently a Unit Supervisor for the Motivational Unit at the NRC. Mastny previously was a Staff Registered Nurse, a License Practicing Nurse, and a Unit Supervisor on 3-East at the NRC. (Filing No. 45-6 at CM/ECF p. 1, ¶ 5.)

83.    Mastny has not been involved in any of Brown's treatment, or any of the scoring of Brown's treatment, since Brown was readmitted to the NRC in October 2016. (Filing No. 45-6 at CM/ECF p. 2, ¶¶ 8, 9; Filing No. 53 at CM/ECF p. 43, Response to Interrogatory No. 5.)

84.    Mastny was not part of Brown's treatment team when Brown returned to the NRC.[7] (Filing No. 45-6 at CM/ECF p. 2, ¶ 10.)

85.    Mastny was not involved in the decision to start Brown at Level One when Brown returned to the NRC. (Filing No. 45-6 at CM/ECF p. 2, ¶ 11.)

86.    Mastny did not take part in any discussions regarding Brown wearing female clothing. It was not part of her job duties to have such discussions. (Filing No. 45-6 at CM/ECF p. 2, ¶ 12.)

_____

[7] The defendants' brief states that "*Brown* was not part of *Mastny's* treatment team when Brown returned to the NRC," but the court assumes this is a typographical error and has corrected it. (Filing No. 45-6 at CM/ECF p. 2, ¶ 10 (emphasis added).)

87.     Mastny never conspired to give Brown "negative" scores after Brown talked to the Ombudsman. (Filing No. 45-6 at CM/ECF p. 2, ¶ 14.)

88.     Mastny never prevented Brown from advancing in treatment because Brown contacted the Ombudsman. (Filing No. 45-6 at CM/ECF p. 2, ¶ 15.)

89.     Mastny was not aware Brown had contacted the Ombudsman upon returning to the NRC. (Filing No. 45-6 at CM/ECF p. 2, ¶ 16.)

90.     Mastny believes Brown has the right to contact the Ombudsman. Mastny knows the number for the Ombudsman's office is posted in several locations in the NRC. (Filing No. 45-6 at CM/ECF p. 2, ¶ 17.)

91.     Mastny does not care if Brown contacts the Ombudsman. (Filing No. 45-6 at CM/ECF p. 3, ¶ 18.)

92.     Mastny never prevented Brown from advancing in treatment because Brown sued her. (Filing No. 45-6 at CM/ECF p. 3, ¶ 19.)

93.     Mastny heard about the lawsuit when she received the documents in the mail on or about June 14, 2017. Mastny does not remember the exact date she received the documents. (Filing No. 45-6 at CM/ECF p. 3, ¶ 20.)

94.     Mastny believes Brown has the right to file a lawsuit. (Filing No. 45-6 at CM/ECF p. 3, ¶ 21.)

**Lori Strong**

95.     At all times relevant, Strong was a Registered Nurse licensed to practice nursing in the State of Nebraska. (Filing No. 45-7 at CM/ECF p. 1, ¶ 3.)

96.     Strong has been employed by the NRC as a Nurse Manager since December 20, 2010. (Filing No. 45-7 at CM/ECF p. 1, ¶ 4.)

97.     Strong has not been involved in Brown's treatment since Brown was readmitted to the NRC in October 2016. (Filing No. 45-7 at CM/ECF p. 2, ¶¶ 7, 8; Filing No. 53 at CM/ECF p. 38, Response to Interrogatory No. 15.)

98.     It is not within Strong's authority to determine the treatment level for any patient upon their admission to the NRC. (Filing No. 45-7 at CM/ECF p. 2, ¶ 9.)

99.     Strong has not interfered with Brown's advancement on the treatment scale. (Filing No. 45-7 at CM/ECF p. 2, ¶ 10)

100.    Strong has not refused to allow Brown to wear female clothing. It is not within Strong's authority to determine the clothing Brown is allowed to wear at the NRC. (Filing No. 45-7 at CM/ECF p. 2, ¶ 11.)

101.    The only interaction Strong has had with Brown since November 1, 2016 was in August 2017 when Brown would not agree to allow her to administer Brown's medications. Strong agreed, the medications were administered by another nurse, and there was no problem. (Filing No. 45-7 at CM/ECF p. 2, ¶ 12; Filing No. 53 at CM/ECF p. 37, Response to Interrogatory No. 8.)

102.    Strong has not "conspired" against Brown to give "negative scores" after Brown contacted the Ombudsman. (Filing No. 45-7 at CM/ECF p. 2, ¶ 14.)

103.    Strong has not participated in Brown's scoring since Brown returned to the NRC. (Filing No. 45-7 at CM/ECF p. 2, ¶ 15; Filing No. 53 at CM/ECF p. 38, Response to Interrogatory No. 15.)

104.   Strong never prevented Brown from advancing in treatment because Brown contacted the Ombudsman. (Filing No. 45-7 at CM/ECF p. 2, ¶ 16.)

105.   Strong was not aware Brown had contacted the Ombudsman. (Filing No. 45-7 at CM/ECF p. 2, ¶ 17.)

106.   Strong believes Brown has the right to contact the Ombudsman. (Filing No. 45-7 at CM/ECF p. 3, ¶ 18.)

107.   Strong does not care if Brown contacts the Ombudsman. (Filing No. 45-7 at CM/ECF p. 3, ¶ 19.)

108.   Strong never prevented Brown from advancing in treatment because Brown sued her. (Filing No. 45-7 at CM/ECF p. 3, ¶ 20.)

109.   Strong does not recall specifically when she learned about this lawsuit. (Filing No. 45-7 at CM/ECF p. 3, ¶ 21.)

110.   Strong believes Brown has the right to file a lawsuit. (Filing No. 45-7 at CM/ECF p. 3, ¶ 22.)

## Dr. Jean Laing

111.   Dr. Laing has been a Licensed Psychologist in the State of Nebraska since 1984. (Filing No. 45-8 at CM/ECF p. 1, ¶ 3.)

112.   Dr. Laing has been employed at the NRC for approximately 35 years. (Filing No. 45-8 at CM/ECF p. 1, ¶ 4.)

113.   At all times relevant, Dr. Laing served as a Licensed Psychologist at the NRC. (Filing No. 45-8 at CM/ECF p. 1, ¶ 5.)

114.  Dr. Laing is not a member of the NRC administration. Dr. Laing is a clinician and member of the NRC medical staff. (Filing No. 45-8 at CM/ECF p. 2, ¶ 10.)

115.  Dr. Laing has not been involved in addressing Brown's transgender concerns. (Filing No. 45-8 at CM/ECF p. 2, ¶ 12.)

116.  Dr. Laing was a co-facilitator in Brown's sex offender therapy group during Brown's first admission to the NRC from January 2014 to September 2015. The group met three times a week for approximately 90 minutes a session. During Brown's first admission, Dr. Laing was also a co-facilitator of a psycho-educational group addressing cognitive distortions. Brown participated in the group in July and August of 2014; the group met twice weekly for approximately 60 minutes a session. (Filing No. 45-8 at CM/ECF p. 2, ¶ 13; Filing No. 53 at CM/ECF pp. 27-28, Response to Interrogatory No. 8.)

117.  Brown did not identify transgender issues as a current concern to Dr. Laing during Brown's first admission to the NRC. During presentation of the autobiography assignment in sex offender group in May 2014, Brown reported past consideration of gender reassignment surgery but decided not to proceed with this when "[her] kids had kids" and described being "comfortable with who [she] [was]." (Filing No. 45-8 at CM/ECF p. 2, ¶ 14.)

118.  Upon Brown's readmission to the NRC in October 2016, Dr. Laing was the assessing practitioner for an Admission Psychological Assessment. A primary purpose of the assessment was to assist the treatment team in developing Brown's initial NRC readmission treatment plan. Dr. Laing met with Brown for 75 minutes on November 1, 2016 and 55 minutes on November 2, 2016 as part of this assessment. The assessment reviewed the circumstances which led Brown to being readmitted to the NRC for sex offender treatment, including Brown's treatment priorities of managing anger and sexual boundaries with peers. (Filing No. 45-8 at

CM/ECF p. 3, ¶ 15; Filing No. 53 at CM/ECF p. 28, Responses to Interrogatory Nos. 8, 11.)

119.  During the assessment, Brown volunteered "doing transgendering" at the LRC during the time of engaging in sexual behavior with a peer. Brown volunteered filing "a civil lawsuit against LRC because they were denying [her] transgendered rights." Brown reported being approved to wear female undergarments with gender-neutral outerwear at the LRC. Brown reported beginning to dress up in mother's clothing at 8 or 9 and beginning to dress in women's clothing at age 16. Brown described taking girls' clothing to school in a bag, changing there, and then changing back to the original clothing before going home. Brown reported wearing "complete drag" after leaving school in the 11th grade. (Filing No. 45-8 at CM/ECF p. 3, ¶ 16.)

120.  Brown reported going to clubs and bars and engaging in prostitution in drag. Brown reported planning to have gender reassignment surgery, but legal problems prevented following through with the surgery. Brown reported having electrolysis in 1989, taking estrogen in the past, and participating in therapy regarding gender identity and reassignment from 1997 to 2000 and again from 2002 to 2005. (Filing No. 45-8 at CM/ECF p. 3, ¶ 16.)

121. Dr. Laing found the information Brown provided during the assessment was inconsistent with information from other sources. Brown has repeatedly identified as homosexual to treatment providers, including upon readmission to the NRC. Brown's mother previously reported Brown's clothing in high school was distinctive for emulating Michael Jackson. In the course of presenting an autobiography in sex offender group in May 2014, Brown reported deciding not to proceed with gender reassignment surgery when "[her] kids had kids" and Brown stated being "comfortable with who [she] [was]." Brown has reported having multiple grandchildren. (Filing No. 45-8 at CM/ECF pp. 3-4, ¶ 17.)

122.   At the time of readmission, the general practice for the NRC was for patients returning from LRC to begin treatment at Level One. No consideration was given for changing this practice for Brown due to multiple sexual act outs, threats to staff, and self-reported physical aggression toward a peer while Brown was a patient at the LRC. (Filing No. 45-8 at CM/ECF p. 4, ¶ 18; Filing No. 53 at CM/ECF p. 29, Response to Interrogatory No. 12, p. 73.)

123.   Due to the inconsistency among Brown's self-reports and collateral information from other sources regarding sexual orientation and plans for addressing gender identity, Dr. Laing did not offer the diagnoses of GID or gender dysphoria for Brown. (Filing No. 45-8 at CM/ECF p. 4, ¶ 19.)

124.   The purpose of Brown's treatment plan was to focus on maintaining sexual boundaries with peers and managing anger without aggression so that Brown could return to the LRC and progress through the program there. (Filing No. 45-8 at CM/ECF p. 4, ¶ 20.)

125.   Dr. Laing never mentioned lawsuits to Brown in the context of Brown's treatment progression. (Filing No. 45-8 at CM/ECF p. 4, ¶ 22.)

126.   Dr. Laing never addressed Brown's request for a private bathroom. (Filing No. 45-8 at CM/ECF p. 5, ¶ 24.)

127.   Dr. Laing never prescribed any treatment plan for Brown regarding GID or gender dysphoria. (Filing No. 45-8 at CM/ECF p. 5, ¶ 25.)

128.   Dr. Laing was not involved in the decision making process regarding whether Brown would be approved to wear feminine clothing or make-up while a patient at the NRC. (Filing No. 45-8 at CM/ECF p. 5, ¶ 26.)

129.   Dr. Laing was not involved in the level scoring done in conjunction with Brown's treatment plan after Brown's readmission to the NRC in October

2016. ([Filing No. 45-8 at CM/ECF p. 5](#), ¶ 27; [Filing No. 53 at CM/ECF p. 29](#), Response to Interrogatory No. 15.)

130.   Dr. Laing was not involved in the decision making process regarding whether Brown would be allowed to have a medical evaluation by a specialist for GID or gender dysphoria or estrogen therapy. ([Filing No. 45-8 at CM/ECF p. 5](#), ¶ 28.)

131.   Dr. Laing never prevented Brown from advancing in treatment because Brown contacted the Ombudsman. ([Filing No. 45-8 at CM/ECF p. 5](#), ¶ 29.)

132.   Dr. Laing was not aware Brown contacted the Ombudsman. ([Filing No. 45-8 at CM/ECF p. 5](#), ¶ 30.)

133.   Dr. Laing does not care if Brown contacts the Ombudsman. ([Filing No. 45-8 at CM/ECF p. 5](#), ¶ 31.)

134.   Dr. Laing believes Brown has the right to contact the Ombudsman. ([Filing No. 45-8 at CM/ECF p. 5](#), ¶ 32.)

135.   Dr. Laing never prevented Brown from advancing in treatment because Brown sued her. ([Filing No. 45-8 at CM/ECF p. 5](#), ¶ 33.)

136.   Dr. Laing learned of this lawsuit when she was served on June 16, 2017. ([Filing No. 45-8 at CM/ECF p. 5](#), ¶ 34.)

137.   Dr. Laing believes Brown has the right to file a lawsuit. ([Filing No. 45-8 at CM/ECF p. 5](#), ¶ 35.)

## **Dr. David Mitchell**

138.  At all times relevant, Dr. Mitchell was a Clinical Psychologist at the NRC. (Filing No. 45-9 at CM/ECF p. 1, ¶ 3.)

139.  Dr. Mitchell has been employed at the NRC since September 1, 2009. (Filing No. 45-9 at CM/ECF p. 1, ¶ 4.)

140.  There is no such position as "scoring coordinator" at the NRC. (Filing No. 45-9 at CM/ECF p. 2, ¶ 7; Filing No. 53 at CM/ECF p. 67, Response to Interrogatory No. 6.)

141.  Dr. Mitchell is not part of the NRC administration. Dr. Mitchell is part of the NRC medical staff. (Filing No. 45-9 at CM/ECF p. 2, ¶ 8.)

142.  Dr. Mitchell was one of the group facilitators for Brown's sex offender therapy group from October 2016 through July 1, 2017. (Filing No. 45-9 at CM/ECF p. 2, ¶ 9.)

143.  Dr. Mitchell and the sex offender therapy group would discuss Brown's filing of lawsuits in a therapeutic context. (Filing No. 45-9 at CM/ECF p. 2, ¶¶ 12-13.)

144.  Dr. Mitchell does not recall ever discussing scoring with Brown. (Filing No. 45-9 at CM/ECF p. 2, ¶ 14.)

145.  Dr. Mitchell had no part in determining whether Brown was allowed to dress as a women at the NRC. Dr. Mitchell was not part of Brown's treatment team. (Filing No. 45-9 at CM/ECF pp. 2-3, ¶ 15.)

146. Dr. Mitchell never prevented Brown from advancing in treatment because Brown contacted the Ombudsman. (Filing No. 45-9 at CM/ECF p. 3, ¶ 16.)

147. Dr. Mitchell believes it is Brown's right to contact the Ombudsman. (Filing No. 45-9 at CM/ECF p. 3, ¶ 17.)

148. Dr. Mitchell does not care if Brown contacts the Ombudsman. (Filing No. 45-9 at CM/ECF p. 3, ¶ 18.)

149. Dr. Mitchell never prevented Brown from advancing in treatment because Brown filed a lawsuit against him. (Filing No. 45-9 at CM/ECF p. 3, ¶ 19.)

150. Dr. Mitchell does not remember the exact date he received the lawsuit. (Filing No. 45-9 at CM/ECF p. 3, ¶ 20.)

151. Dr. Mitchell believes Brown has the right to file a lawsuit. (Filing No. 45-9 at CM/ECF p. 3, ¶ 21.)

**Beverley Lueshen**

152. Lueshen has been employed at the NRC since September of 1986. (Filing No. 45-10 at CM/ECF p. 1, ¶ 3.)

153. Lueshen is a Licensed Mental Health Practitioner and Licensed Drug and Alcohol Counselor in the State of Nebraska. Lueshen has held these positions for approximately 19 years. (Filing No. 45-10 at CM/ECF p. 1, ¶ 4.)

154. Lueshen is not part of the NRC administration. Lueshen is a clinician and part of the NRC psychology staff. (Filing No. 45-10 at CM/ECF p. 2, ¶ 8.)

155.   Lueshen was not part of the decision making process as to whether Brown would be allowed to wear female clothing at the NRC. ([Filing No. 45-10 at CM/ECF p. 2](#), ¶ 10.)

156.   Lueshen never prevented Brown from advancing in treatment because Brown contacted the Ombudsman. ([Filing No. 45-10 at CM/ECF p. 2](#), ¶ 11.)

157.   Lueshen was not aware Brown claimed to have contacted the Ombudsman until she received the lawsuit. ([Filing No. 45-10 at CM/ECF p. 2](#), ¶ 12.)

158.   Lueshen believes Brown has the right to contact the Ombudsman. ([Filing No. 45-10 at CM/ECF p. 2](#), ¶ 13.)

159.   Lueshen does not care if Brown contacts the Ombudsman. ([Filing No. 45-10 at CM/ECF p. 2](#), ¶ 14.)

160.   Lueshen never prevented Brown from advancing in treatment because Brown sued her. ([Filing No. 45-10 at CM/ECF p. 2](#), ¶ 15.)

161.   Lueshen does not specifically recall when she learned about the lawsuit, or when she was served with the lawsuit. ([Filing No. 45-10 at CM/ECF p. 3](#), ¶ 16.)

162.   Lueshen believes Brown has the right to file a lawsuit. ([Filing No. 45-10 at CM/ECF p. 3](#), ¶ 17.)

**Donna Crist**

163.   Crist was employed at the NRC from July 1999 to December 2001. Crist has been employed with the NRC since December 2012. ([Filing No. 45-11 at CM/ECF p. 1](#), ¶ 3.)

164. At all times relevant, Crist was employed as a Licensed Registered Nurse at the NRC. (Filing No. 45-11 at CM/ECF p. 1, ¶ 4.)

165. Crist never prevented Brown from advancing in treatment because Brown contacted the Ombudsman. (Filing No. 45-11 at CM/ECF p. 2, ¶ 10.)

166. Crist was not aware Brown contacted the Ombudsman. (Filing No. 45-11 at CM/ECF p. 2, ¶ 11.)

167. Crist does not care if Brown contacted the Ombudsman. (Filing No. 45-11 at CM/ECF p. 2, ¶ 12.)

168. Crist believes Brown has the right to contact the Ombudsman. (Filing No. 45-11 at CM/ECF p. 2, ¶ 13,)

169. Crist never prevented Brown from advancing in treatment because Brown sued her. (Filing No. 45-11 at CM/ECF p. 2, ¶ 14.)

170. Crist does not remember when she first learned about the lawsuit. (Filing No. 45-11 at CM/ECF p. 2, ¶ 15.)

171. Crist was served with the lawsuit sometime in June of 2016. (Filing No. 45-11 at CM/ECF p. 2, ¶ 16.)

172. It does not bother Crist that Brown filed a lawsuit. (Filing No. 45-11 at CM/ECF p. 2, ¶ 17.)

173. Crist believes Brown has the right to file a lawsuit. (Filing No. 45-11 at CM/ECF p. 2, ¶ 18.)

Brown alleges that defendants Kroll, Hansen, Mastny, Strong, Dr. Laing, Dr. Mitchell, Lueshen, and Crist made certain defamatory, harassing, or belittling statements to Brown and/or told her she would not progress in treatment to the LRC if she continued "exercising female characteristics" or voicing her transgender rights. These defendants deny making such statements. Resolution of whether these statements were in fact made, however, is unnecessary, because the statements, taken as true, do not create a genuine issue of disputed material fact with respect to any of the constitutional claims before the court on summary judgment.

## III.  ANALYSIS

### A.  Standard of Review

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). It is not the court's function to weigh evidence in the summary judgment record to determine the truth of any factual issue. *Schif v. Eli Lilly & Co.*, 687 F.3d 947, 949 (8th Cir. 2012). In passing upon a motion for summary judgment, the district court must view the facts in the light most favorable to the party opposing the motion. *Dancy v. Hyster Co.*, 127 F.3d 649, 652-53 (8th Cir. 1997).

In order to withstand a motion for summary judgment, the nonmoving party must substantiate allegations with "'sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy.'" *Moody v. St. Charles Cnty.*, 23 F.3d 1410, 1412 (8th Cir. 1994) (quoting *Gregory v. City of Rogers*, 974 F.2d 1006, 1010 (8th Cir. 1992)). "A mere scintilla of evidence is insufficient to avoid summary judgment." *Id.* Essentially, the test is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

A party opposing summary judgment "may not rest upon the mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial, and must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Ingrassia v. Schafer*, 825 F.3d 891, 896 (8th Cir. 2016) (quoting *Anderson*, 477 U.S. at 256-57 (quotations omitted); *see also Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-60 (1970).

## B. Qualified Immunity

Defendants argue that they are entitled to summary judgment because they are immune from suit in their individual capacities under the doctrine of qualified immunity. "Qualified immunity shields government officials from liability for civil damages and the burdens of litigation 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *McKenney v. Harrison*, 635 F.3d 354, 358 (8th Cir. 2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Stated another way, qualified immunity shields a defendant from suit if he or she could have reasonably believed his or her conduct to be lawful in light of clearly established law and the information that the defendant possessed." *Smithson v. Aldrich*, 235 F.3d 1058, 1061 (8th Cir. 2000) (internal quotation and citation omitted). "The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Id.*

Qualified immunity requires a two-part inquiry: (1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct. *Nance v. Sammis*, 586 F.3d 604, 609 (8th Cir. 2009). If no reasonable fact-finder could answer yes to both of these questions, the official is entitled to qualified immunity. *Id.* "Courts may exercise their discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." *Akins v. Epperly*, 588 F.3d 1178, 1183 (8th Cir. 2009).

Accordingly, in reviewing this motion, the court will first examine whether the facts as alleged by Brown reasonably show that the individually-named defendants have violated Brown's constitutional rights. If the facts do not show a violation, the court need not proceed further with the qualified immunity analysis.

## C. Deliberate Indifference Claim

Brown alleges that defendants Dr. Beltagui and Schumacher were deliberately indifferent to her serious medical need (GID) by denying her a medical evaluation by a specialist and estrogen therapy.[8]

Where a civilly-committed patient's Fourteenth Amendment claim is for constitutionally deficient medical care, the Eighth Circuit applies the deliberate indifference standard from the Eighth Amendment. *Mead v. Palmer*, 794 F.3d 932, 936 (8th Cir. 2015) (quotation marks and citation omitted); *Revels v. Vincenz*, 382 F.3d 870, 874 (8th Cir. 2004) (recognizing that Fourteenth Amendment applied to involuntarily committed patient's § 1983 claims, but applying Eighth Amendment standards because patient's "confinement is subject to the same safety and security

---

[8] The court notes that Brown has requested that the court order defendants to grant her request to seek medical attention for gender-identity disorder and to receive hormone treatments. (Filing No. 22 at CM/ECF p. 11.) However, Brown was transferred to the LRC on February 28, 2018. (Filing No. 61.) As a result of Brown's transfer from the NRC to the LRC, she cannot recover any injunctive relief to medical treatment at the NRC. *See Randolph v. Rodgers*, 170 F.3d 850, 856-57 (8th Cir. 1999) (injunctive relief may not be obtained to improve conditions at a facility from which the plaintiff has been transferred or released).

concerns as that of a prisoner"). Therefore, while Brown is not a prisoner, Eighth Amendment standards apply to her claim.[9]

In order to prevail on this claim, Brown must demonstrate that (1) she suffered from an objectively serious medical need, and (2) the defendants knew of,

---

[9] The Eighth Circuit Court of Appeals has applied this Eighth Amendment analysis to claims similar to Brown's, as have the United States Supreme Court and courts in other jurisdictions. *See Reid v. Griffin*, 808 F.3d 1191, 1192 (8th Cir. 2015) (applying Eighth Amendment to inmate's claim that prison officials refused to provide hormone-replacement therapy for GID); *Long v. Nix*, 86 F.3d 761 (8th Cir. 1996) (prison officials were not deliberately indifferent to medical needs of prisoner who claimed to be transsexual and, thus, prison officials were not liable in prisoner's § 1983 action alleging that prison officials' failure to treat inmate's GID constituted cruel and unusual punishment; assuming without deciding that GID is serious medical need for purposes of Eighth Amendment analysis); *White v. Farrier*, 849 F.2d 322 (8th Cir. 1988) (applying Eighth Amendment to transsexual inmate's § 1983 claim against prison officials who refused to permit inmate to have sexual reassignment surgery, cosmetic procedures, hormone therapy, female clothing and cosmetics, and transfer to women's prison; concluding that transsexualism is serious medical need to which prison officials may not act with deliberate indifference); *see also Farmer v. Brennan*, 511 U.S. 825 (1994) (§ 1983 claim brought by preoperative transsexual inmate challenging prison officials' failure to protect him from danger analyzed under Eighth Amendment); *Kosilek v. Spencer*, 774 F.3d 63, 90 (1st Cir. 2014) (applying Eighth Amendment to inmate's lawsuit against prison officials for failure to provide sex-reassignment surgery to treat inmate's GID); *Battista v. Clarke*, 645 F.3d 449, 452 (1st Cir. 2011) ("although protection of civilly committed persons rests on due process concepts rather than the Eighth Amendment, deliberate indifference is the familiar test for medical care"; affirming district court's finding that state officials were deliberately indifferent—or exercised unreasonable professional judgment—with regard to medical needs of civil detainee with GID by denying detainee hormone therapy); *Konitzer v. Frank*, 711 F. Supp. 2d 874, 908-09 (E.D. Wis. 2010) (applying Eighth Amendment analysis and denying in part prison's motion for summary judgment in male-to-female transgender inmate's suit to gain access to treatment for GID).

but deliberately disregarded, that need. *Saylor v. Nebraska*, 812 F.3d 637, 644 (8th Cir. 2016) (as amended Mar. 4, 2016). "A medical condition is 'objectively serious' if the prisoner was diagnosed by a doctor or it is so obvious that a lay person would recognize the medical need." *Id.* "The subjective prong of deliberate indifference is an extremely high standard that requires a mental state of more . . . than gross negligence. It requires a mental state akin to criminal recklessness." *Id.* (internal quotation marks and citations omitted).

### Dr. Beltagui

The evidence demonstrates that it was beyond the scope of Dr. Beltagui's practice to determine whether Brown was a candidate for hormone therapy. (Filing No. 45-4 at CM/ECF p. 3, ¶ 15.) In addition, there is no evidence, other than Brown's self-reports, indicating that Brown took hormone pills before incarceration. (Filing No. 45-4 at CM/ECF p. 4, ¶ 17.) Brown never mentioned being transgendered or requiring hormone therapy to Dr. Beltagui during Brown's first admission to the NRC. (Filing No. 45-4 at CM/ECF p. 4, ¶ 18.) Dr. Beltagui explained that not every individual who carries the diagnosis of gender dysphoria is a candidate for hormone therapy, and that such a determination should be made by a doctor who specializes in transgender care and hormone therapy after an evaluation.[10] (Filing No. 45-4 at CM/ECF p. 4, ¶ 15.) As such, on December 2, 2016 (before Brown was diagnosed with gender dysphoria), Dr. Beltagui submitted

---

[10] Case law does not establish that an inmate is automatically entitled to hormone treatment for gender dysphoria. *See Reid*, 808 F.3d at 1193 (no Eighth Amendment violation when prison officials refused to provide hormone-replacement therapy for GID when numerous mental-health professionals evaluated inmate and none diagnosed her with GID or concluded that treatment for such disorder was appropriate); *White*, 849 F.2d at 327 (Courts that have addressed the issue have concluded that inmates do not have a constitutional right to hormone therapy.").

a written referral request for Brown to see a doctor in Omaha who specializes in transgender care and hormone therapy for an evaluation. (Filing No. 45-4 at CM/ECF p. 2, ¶ 9; Filing No. 53 at CM/ECF pp. 77-78, Response to Interrogatory No. 14, p. 83.)

The referral request was handled as follows:

The request was discussed at the Clinical Directors Meeting of that same date. The decision of the meeting was to refer the matter to the Sex-Offender Council so that Behavior Health Director, Sherri Dawson, and Interim Regional Centers Administrator, Stacey Werth-Sweeny, could participate in the discussion. Dawson and Sweeny were scheduled to be present at the NRC that day and would be in the Sex-Offender Council Meeting to occur that day. I was not present at the meeting but was later informed by NRC Clinical Director, Stephen O'Neill, M.D., that Brown's referral had been denied. I advised Brown of this decision. A few days later, however, I was further informed by the at-the-time NRC Facility Operating Officer, Tylynne Bauer, that Brown's referral request had not actually been denied or approved; rather, the request remained pending while it was determined whether Brown had been on hormone therapy before becoming a resident of the NRC. I advised Brown of this clarification and explained the initial denial had been a miscommunication as there was a need to gather more information. I believe the initial denial was a miscommunication and not intentional. Brown had reported that [s]he had been treated by Dr. Walburn for hormone therapy prior to coming to the NRC, but the NRC received a letter from Dr. Walburn indicating Brown had not been treated for hormone therapy. On July 16, 2017, NRC Facility Operating Officer, John Kroll, provided a written response to the referral request. Kroll's written response detailed that the request was not approved at first because the plan was to verify if Brown had previously been treated with hormone therapy before coming to the NRC. Kroll's response went on to reiterate the circumstances regarding Dr. Walburn's letter stating that he had not treated Brown with hormone therapy. Kroll's response concluded by denying the referral request on the basis that there was no verification that Brown had been under hormone therapy before coming to the NRC.

(Filing No. 53 at CM/ECF pp. 78-79, Response to Interrogatory No. 15.)

This evidence demonstrates that Dr. Beltagui did not disregard Brown's medical needs or deny treatment for her gender non-conformity or gender dysphoria. To the contrary, even before Brown was diagnosed with gender dysphoria and despite no indication Brown had taken hormones in the past, Dr. Beltagui requested that Brown be referred to a specialist for the purpose of determining whether she was a candidate for hormone treatment. The referral request was ultimately denied, but not by Dr. Beltagui.[11] Thus, although Brown was denied an evaluation by a specialist for purposes of determining whether hormone treatment was appropriate, the evidence indicates that Dr. Beltagui was not involved in the decision to deny the evaluation. Drawing all inferences in favor of Brown, Dr. Beltagui is entitled to summary judgment because Brown presented no evidence to support that Dr. Beltagui participated in the decision to deny Brown a medical evaluation by a specialist and estrogen therapy.

**Schumacher**

Similarly, there is no evidence that Schumacher, a physician assistant, denied Brown a medical evaluation by a specialist and estrogen therapy. Schumacher had no documentation indicating that Brown had received or been prescribed hormone treatment before incarceration. (Filing No. 45-3 at CM/ECF p. 2, ¶¶ 12-15.) Schumacher advised Brown that her requests for hormone therapy and estrogen treatment needed to be directed to the psychiatrist, because it was not a part of her scope of practice to grant such requests. (Filing No. 45-3 at CM/ECF

---

[11] Brown has failed to assert a deliberate indifference claim against any individual involved in the decision to deny the referral request. *See Hicklin v. Precynthe*, No. 4:16-CV-01357-NCC, 2018 WL 806764, at *11 (E.D. Mo. Feb. 9, 2018) ("The denial of hormone therapy based on a blanket rule, rather than an individualized medical determination, constitutes deliberate indifference in violation of the Eighth Amendment." (citing cases)).

p. 2, ¶ 11; Filing No. 53 at 104, Responses to Interrogatory Nos. 13, 14.) As discussed above, the evidence reflects that Brown's request was referred to Dr. Beltagui, a psychiatrist, who then submitted a referral request, which was denied. Drawing all inferences in favor of Brown, Schumacher is entitled to summary judgment because Brown presented no evidence to support that Schumacher was involved in the decision to deny Brown an evaluation by a specialist for hormone treatment.

## D.  First Amendment Retaliation Claim

Brown claims that defendants Kroll, Hansen, Mastny, Strong, Dr. Laing, Dr. Mitchell, Lueshen, and Crist have prevented her from advancing in her treatment program in retaliation for Brown filing lawsuits and contacting the Ombudsman regarding the exercise of her "transgender rights." (Filing No. 28 at CM/ECF p. 11, 14.)

To establish a First Amendment retaliation claim under 42 U.S.C. § 1983, the plaintiff must show (1) she engaged in protected activity; (2) the government official took adverse action against her that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity. *Peterson v. Kopp*, 754 F.3d 594, 602 (8th Cir. 2014); *Revels*, 382 F.3d at 876; *Naucke v. City of Park Hills*, 284 F.3d 923, 927-28 (8th Cir. 2002). The retaliatory conduct itself need not be a constitutional violation; the violation is acting in retaliation for the exercise of a constitutionally protected right. *Spencer v. Jackson Cnty.*, 738 F.3d 907, 911 (8th Cir. 2013). Further, "[t]o prevail in an action for First Amendment retaliation, [a plaintiff] must show a causal connection between [the defendant's] retaliatory animus and [the plaintiff's] subsequent injury." *Kilpatrick v. King*, 499 F.3d 759, 767 (8th Cir. 2007) (citing *Hartman v. Moore*, 547 U.S. 250 (2006)).

Defendants Kroll, Hansen, Mastny, Strong, Dr. Laing, Dr. Mitchell, Lueshen, and Crist do not dispute that filing a lawsuit or contacting the

Ombudsman constitutes engagement in an activity protected under the First Amendment. It is well established that the right to file a legal action is protected under the First Amendment. *Spencer*, 738 F.3d at 911. The law is also settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for speaking out. *Peterson*, 754 F.3d at 602. These defendants do dispute, however, that Brown can prove the other two essential elements of her retaliation claims.

There is no evidence, beyond Brown's own allegations, that the defendants were motivated to take adverse action based on Brown filing lawsuits and contacting the Ombudsman regarding the exercise of her "transgender rights." *See id.* (under the third prong of the First Amendment retaliation claim test, a plaintiff must show that the retaliatory motive was a "substantial factor" or "but-for cause" of the adverse action; in other words, a plaintiff must show he or she was singled out because of exercise of constitutional rights). The defendants presented evidence, which Brown has not properly disputed, that the defendants knew Brown had a right to file lawsuits and to contact the Ombudsman and did not care whether Brown exercised those rights. There is also no evidence that any action by the defendants prevented Brown from exercising her First Amendment rights. *See Garcia v. City of Trenton*, 348 F.3d 726, 728-29 (8th Cir. 2003). Indeed, Brown has continued to exercise her First Amendment rights by filing complaints, grievances, and/or lawsuits. *See, e.g.*, *Brown v. Kroll*, 8:17CV0294 (D. Neb.).

Brown has cited no evidence to support her argument that her placement at treatment Level One upon her return to the NRC was in retaliation for filing lawsuits or contacting the Ombudsman. Rather, the evidence establishes that, when a patient is readmitted to the NRC from the LRC, the general practice is for patients to begin treatment at Level One. (Filing No. 45-8 at CM/ECF p. 4, ¶ 18.) The evidence shows that no consideration was given for changing this practice for Brown due to her multiple sexual act outs, threats to staff, and self-reported physical aggression toward a peer while she was a patient at the LRC. (Filing No. 45-8 at CM/ECF p. 4, ¶ 18.) Further, because the patients do not progress in

treatment in the same fashion, Brown cannot establish retaliatory action by simply alleging that certain patients have progressed through treatment more quickly than she has.

Brown bases much of her retaliation claim on allegations that several of the defendants told her that she would not progress in treatment if she continued to speak out about her transgender rights or continued to exercise "female characteristics." The defendants dispute making these comments. Regardless, even if these comments are taken as true, they do not establish that the defendants in fact prevented Brown from progressing in treatment in retaliation for her exercising her transgender rights.

The defendants have presented affidavit evidence, discussed below, demonstrating that they did not participate in Brown's treatment decisions or treatment plan scoring and/or did not prevent Brown from progressing in treatment in retaliation for Brown exercising her First Amendment rights:

### Kroll

Upon Brown's readmission to the NRC, Kroll's involvement with Brown was mainly through responding to grievances. (Filing No. 45-2 at CM/ECF p. 2, ¶ 9.) Kroll had no authority or influence on Brown's treatment progression or scoring and was not responsible for making entries in Brown's treatment file. (Filing No. 45-2 at CM/ECF p. 3, ¶¶ 13, 15, 26.) The treatment team, of which Kroll was not a member, was responsible for making decisions regarding Brown's treatment progression and making entries in Brown's treatment file. (Filing No. 45-2 at CM/ECF p. 3, ¶¶ 13, 15.) Beyond Brown's own allegations, there is no evidence that Kroll circumvented the treatment team and refused Brown the ability to progress past treatment Level One or made an entry in Brown's treatment file to the mental health board. Indeed, the evidence shows that Kroll never corresponded with the mental health board about Brown. (Filing No. 45-2 at CM/ECF p. 3, ¶ 13.)

**Hansen**

Hansen does not individually determine the level assignment for any patient upon their admission to the NRC. (Filing No. 45-5 at CM/ECF p. 2, ¶ 8.) Rather, when a patient is admitted to the NRC, the level assignment is determined by the full treatment team. (Filing No. 45-5 at CM/ECF p. 2, ¶ 8.) As set forth above, the NRC's general practice is to begin treatment at Level One when a patient is readmitted to the NRC from the LRC and no consideration was given for changing this practice for Brown due to her multiple sexual act outs, threats to staff, and self-reported physical aggression toward a peer while she was a patient at the LRC. (Filing No. 45-8 at CM/ECF p. 4, ¶ 18; Filing No. 53 at CM/ECF p. 29, Response to Interrogatory No. 12, p. 73.) Hansen never scored, or participated in the scoring of, Brown's treatment plan. (Filing No. 45-5 at CM/ECF p. 2, ¶ 12; Filing No. 53 at 91, Response to Interrogatory No. 17.)

**Mastny**

After Brown's readmission to the NRC, Mastny was not involved in the decision to start Brown at Level One, was not involved in any of Brown's treatment or scoring of Brown's treatment, was not part of Brown's treatment team, and did not conspire to give Brown "negative" scores after Brown talked to the Ombudsman. (Filing No. 45-6 at CM/ECF p. 2, ¶¶ 9-11, 14; Filing No. 53 at CM/ECF p. 43, Response to Interrogatory No. 5.)

**Strong**

After Brown's readmission to the NRC, Strong was not involved in Brown's treatment, did not participate in Brown's treatment scoring, did not conspire against Brown to give her "negative scores," and did not interfere with Brown's advancement on the treatment scale. (Filing No. 45-7 at CM/ECF p. 2, ¶¶ 8, 10, 14, 15; Filing No. 53 at CM/ECF p. 38, Response to Interrogatory No. 15, p. 38, Response to Interrogatory No. 15.) Indeed, Strong does not have the authority to

determine the treatment level for any patient upon their admission to the NRC. (Filing No. 45-7 at CM/ECF p. 2, ¶ 9.) Furthermore, the only interaction Strong had with Brown after her readmission to the NRC was in August 2017 when Brown would not allow Strong to administer Brown's medications. (Filing No. 45-7 at CM/ECF p. 2, ¶ 12; Filing No. 53 at CM/ECF p. 37, Response to Interrogatory No. 8.) The medications were then administered by another nurse without any problem. (Filing No. 45-7 at CM/ECF p. 2, ¶ 12; Filing No. 53 at CM/ECF p. 37, Response to Interrogatory No. 8.)

**Dr. Laing**

Dr. Laing assisted the treatment team in developing Brown's initial NRC readmission treatment plan, including starting Brown's treatment at Level One based on the NRC's general practice and on Brown's multiple sexual act outs, threats to staff, and self-reported physical aggression toward a peer while a patient at the LRC. (Filing No. 45-8 at CM/ECF p. 3, ¶ 15, p. 4, ¶ 18.) Dr. Laing was not involved in the level scoring related to Brown's treatment plan after Brown's readmission to the NRC. (Filing No. 45-8 at CM/ECF p. 5, ¶ 27.)

**Dr. Mitchell**

Dr. Mitchell was not part of Brown's treatment team and has not prevented Brown from advancing in treatment. (Filing No. 45-9 at CM/ECF p. 2, ¶ 15, p. 3, ¶ 19.) Brown is not the "scoring coordinator"; there is no such position at the NRC. (Filing No. 45-9 at CM/ECF p. 2, ¶ 7.)

**Lueshen**

Lueshen is not part of the NRC administration. (Filing No. 45-10 at CM/ECF p. 2, ¶ 8.) She never prevented Brown from advancing in treatment because Brown contacted the Ombudsman or filed this lawsuit. (Filing No. 45-10 at CM/ECF p. 2, ¶¶ 11, 15.)

**Crist**

Crist never prevented Brown from advancing in treatment because Brown contacted the Ombudsman or filed this lawsuit. (Filing No. 45-11 at CM/ECF p. 2, ¶¶ 10, 14.)

Brown has failed to properly dispute this evidence.

To survive summary judgment on her retaliation claim, Brown must present evidence of a causal connection between constitutionally protected activity and an adverse action. There is nothing to show any action of any of the defendants was at all motivated by Brown's engagement in an activity protected under the First Amendment. Brown simply presumes retaliation based on nothing more than conclusory statements. There is no evidence any of the defendants treated Brown any differently than any other NRC patient due to Brown's exercise of constitutional rights.

## E.  Equal Protection Claim

Last, Brown claims that all the defendants violated the Equal Protection Clause's prohibition against sex-based discrimination when they treated her unfavorably because of her gender non-conformity. Brown's equal protection claims focus on the denial of her request for certain female clothing and items, disparate treatment progression, and the denial of her request for a private bathroom.

The Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The purpose of the Equal Protection Clause "is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination." *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 611

(2008) (quoting *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam)). Proof that discriminatory intent was a motivating factor is required to show a violation of the Equal Protection Clause. *Arlington Heights v. Metro Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977).

An equal protection claim may be established in two ways. The first requires a plaintiff to "show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class." *Washington v. Davis*, 426 U.S. 229, 239-40 (1976). If the claims do not involve a suspect classification, a plaintiff can establish an equal protection "class of one" claim by alleging that she "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Olech*, 528 U.S. at 564; *see also Flowers v. City of Minneapolis*, 558 F.3d 794, 798 (8th Cir. 2009). To prevail under this theory, a plaintiff must show that (1) he or she is a member of an identifiable class; (2) he or she was intentionally treated differently from others similarly situated; and (3) there is no rational basis for the difference in treatment. *Olech*, 528 U.S. at 564.

The Supreme Court has not decided whether transgender individuals constitute a protected or "suspect class." *See Campbell v. Bruce*, No. 17-CV-775-JDP, 2017 WL 6334221, at *3 (W.D. Wis. Dec. 1, 2017) ("Neither the Seventh Circuit nor the Supreme Court has determined whether transgender individuals constitute a protected class."); *Bd. of Educ. of the Highland Local Sch. Dist. v. United States Dep't of Educ.*, 208 F. Supp. 3d 850, 872 (S.D. Ohio 2016) ("The Supreme Court has not decided whether transgender status is a quasi-suspect class under the Equal Protection Clause."); *Denegal v. Farrell*, No. 1:15-cv-1251, 2016 WL 3648956, at *7 (E.D. Cal. July 8, 2016) (Findings and Recommendations of Magistrate Judge adopted on Sept. 9, 2016) ("The level of scrutiny applicable to classifications based on transgender status has not been determined by the United States Supreme Court," and "[c]ourts in this circuit have reached differing conclusions as to the level of scrutiny to be applied.").

This case, however, does not require the court to reach the question of whether transgender status is per se entitled to heightened scrutiny. No matter what level of scrutiny applies, the defendants' treatment of Brown must be balanced against penological or institutional interests like safety and protection from violence. *See Fegans v. Norris*, 537 F.3d 897, 906 (8th Cir. 2008) (inmate's equal protection claim failed when prison had valid penological interests of safety and security for differing hair-length rules for men and women); *Tates v. Blanas*, No. S-00-2539, 2003 WL 23864868, at *10 (E.D. Cal. Mar. 11, 2003) ("With regard to [transsexual detainee's request for a] bra, the possibility that it could be misused as a weapon or noose must be balanced against any medical or psychological harm to him resulting from denial of a bra"; defendants may not "apply a categorical rule . . . that denies an inmate a bra simply because he is a transgender or is housed in a men's ward").

Upon Brown's readmission to the NRC, Brown was approved to wear female undergarments and gender neutral outerwear, but her request to wear female clothing such as dresses, midriff, low-cut or see-through shirts or blouses, high heels, stockings and nylons, and make-up was denied. (Filing No. 45-2 at CM/ECF p. 3, ¶ 16; Filing No. 45-4 at CM/ECF p. 2, ¶ 6.) Brown's gender dysphoria diagnosis did not affect any decisions regarding the clothing which Brown was approved to wear as a patient at the NRC. (Filing No. 45-2 at CM/ECF p. 5, ¶ 31.)

The evidence demonstrates that the denial of certain female clothing and items was based on the NRC's interest in ensuring patients' safety and protection from violence. The NRC is a mental health hospital treating patients who have difficulty managing sexually deviant thoughts and ideas. (Filing No. 45-2 at CM/ECF pp. 3-4, ¶ 17.) The NRC must prevent patients from making unwanted sexual advances toward other patients, or inappropriately acting out on their sexual urges. (Filing No. 45-2 at CM/ECF p. 4, ¶ 17.) If allowed to wear dresses, midriff, low-cut or see-through shirts or blouses, high heels, stockings and nylons, or make-

up, there was concern that Brown could become a potential target for sexual assault from other patients. ([Filing No. 45-4 at CM/ECF p. 2](), ¶ 7.)

The NRC's institutional-wide interest in safety is demonstrated by the fact that NRC employees are not allowed to wear shorts, skorts, spandex pants, leggings, spaghetti straps, tank tops, or clothing that is excessively tight, see-through, or exposes midriff or cleavage. ([Filing No. 45-2 at CM/ECF p. 4](), ¶ 19.) In furtherance of these interests, all NRC patients and visitors are expected to be neatly dressed and groomed, and all NRC visitors are prevented from wearing shorts, skorts, mini-skirts, tank tops, low-cut tops, see-through, or other provocative or inappropriate clothing during a visit. ([Filing No. 45-2 at CM/ECF p. 4](), ¶ 20.)

Thus, the undisputed evidence establishes that the NRC had a rational, non-discriminatory basis for regulating resident attire and denying Brown's request for certain feminine clothing and items.

Brown also claims disparate treatment based on the defendants' alleged favoritism toward other patients with respect to treatment classification and progression. Brown complains that while she was classified at treatment Level One when she was transferred from the LRC to the NRC, two other patients who were forced to transfer to NRC started at Levels 2 and 3, despite the fact that one of these patients hit an LRC staff member and the other threatened an LRC staff member's family. ([Filing No. 22 at CM/ECF p. 7]().)

"[C]lass-of-one" equal protection claims may not apply to state action that involves "'discretionary decision making based on a vast array of subjective, individualized assessments . . . because treating like individuals differently is an accepted consequence of the discretion granted.'" *Robbins v. Becker*, 794 F.3d 988, 995 (8th Cir. 2015) (quoting *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 602-04 (2008)). Here, the evidence establishes that the defendants' treatment and classification decisions regarding Brown were discretionary, and therefore not

subject to a class-of-one equal protection claim. As previously stated, Brown was placed at treatment Level One upon return to the NRC because it was the general practice of the NRC and no consideration was given for changing this practice as a result of Brown's multiple sexual act outs, threats to staff, and self-reported physical aggression toward a peer while a patient at the LRC. (Filing No. 45-8 at CM/ECF p. 4, ¶ 18.) Furthermore, the defendants need not treat every patient in the identical manner, so long as they would have made the same decision even if that patient was not transgender or did not have gender dysphoria. The evidence demonstrates that each patient has an individualized treatment plan and not every patient progresses in treatment in the same fashion. (Filing No. 45-5 at CM/ECF p. 2, ¶ 9.) Brown fails to present any evidence that the reason for any disparate treatment regarding treatment placement or progression was due to her gender non-conformity.

Brown also complains that her equal protection rights were violated when she was denied a private bathroom. Brown has failed to set forth any meaningful and competent facts to suggest that the denial of a private bathroom was in discrimination of Brown's gender non-conformity and was done to deprive Brown of equal protection. Rather, the evidence establishes that the NRC approves a patient for a private bathroom only when the patient has a physical need for a private bathroom. (Filing No. 45-2 at CM/ECF p. 2, ¶ 10.) Brown was not able to provide any reason why a private bathroom was required other than personal preference; thus, her request for a private bathroom was denied. (Filing No. 45-2 at CM/ECF p. 2, ¶ 10.) In addition, the NRC did not have enough room for Brown to have a private bathroom. (Filing No. 45-2 at CM/ECF p. 2, ¶ 10.) Nonetheless, the NRC endeavored to accommodate Brown's bathroom concerns by ordering that she be allowed to use the bathroom on the unit in private and by instructing other patients on the unit not to use the bathroom when Brown was using it. (Filing No. 45-2 at CM/ECF p. 2, ¶¶ 11, 12.)

With respect to defendant Dawson, the DHHS Director of the Division of Behavioral Health, there is no evidence that she had any personal involvement in

the decisions regarding Brown's requests for female clothing and a private bathroom. (Filing No. 45-1 at CM/ECF p. 2, ¶¶ 7-8.) Any decisions regarding these requests were made by the NRC administration, not Dawson. (Filing No. 45-1 at CM/ECF p. 2, ¶¶ 7-8.) Because there is no evidence that Dawson had any connection with these decisions, and because she cannot be held personally liable on a theory of respondeat superior, she is entitled to summary judgment on the equal protection claim. *See Brown v. Wallace*, 957 F.2d 564, 566 (8th Cir. 1992) (personal involvement of the named defendant is an essential element of any § 1983 claim because the doctrine of respondeat superior does not apply to actions brought under § 1983).

Accordingly, all the defendants are entitled to summary judgment on Brown's equal protection claim.

### F. Summary

The court finds that Brown's claims against each defendant fail as a matter of law. "If the court finds no constitutional violation occurred, the analysis ends and the issue of qualified immunity is not addressed. . . . This is not to say, however, the defendant official is entitled to qualified immunity. Rather, if no constitutional violation occurred, plaintiff's claim fails as a matter of law because plaintiff did not prove an essential element of the § 1983 claim." *Ambrose v. Young*, 474 F.3d 1070, 1077 n.3 (8th Cir. 2007) (citations omitted). Alternatively, because there was no constitutional violation, each defendant is entitled to qualified immunity. *See Payne v. Britten*, 749 F.3d 697, 707 (8th Cir. 2014) ("For example, a district court could begin and end with the first question, granting qualified immunity because there was no constitutional violation.").

## IV.  MOTION TO STRIKE

The defendants have also filed a Motion to Strike (Filing No. 54) various parts of the inmates' declarations in Brown's Exhibits 13 and 14 (Filing No. 53 at CM/ECF pp. 112-23). However, even with those parts of the declarations, Brown does not bring enough evidence to defeat the defendants' summary judgment motion. The declarations largely contain inmates' conclusory opinions about Brown's case or facts not relevant to Brown's claims. Accordingly, the court denies as moot the defendants' Motion to Strike.

IT IS THEREFORE ORDERED that:

1.    Defendants' Motion for Summary Judgment (Filing No. 43) is granted.

2.    Defendants' Motion to Strike (Filing No. 54) is denied.

3.    A separate judgment will be entered.

Dated this 8th day of May, 2018.

BY THE COURT:

s/ *Richard G. Kopf*
Senior United States District Judge